## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **BRIAN McCAFFERTY and MELISSA McCAFFERTY, individually and on behalf of their minor child, C.M.** ) ) ) ) | |
| **Plaintiffs,** ) | |
| ) | **No.: 2:18-cv-01276-JS** |
| **vs.** ) | |
| ) | |
| **NEWSWEEK MEDIA GROUP, LTD, t/a NEWSWEEK, LLC and/or NEWSWEEK, INC. and/or NEWSWEEK** ) ) ) | **JURY TRIAL DEMANDED** |
| ) | |
| **Defendant.** ) | |

### ORDER

AND NOW, this _____ day of _____, 2018, upon consideration of Defendant's Motion to Dismiss Plaintiffs' Amended Complaint, and Plaintiffs' Response in Opposition thereto, it is hereby ORDERED and DECREED that Defendant's Motion is DENIED.


BY THE COURT:


_____

Juan R. Sanchez, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRIAN McCAFFERTY and MELISSA McCAFFERTY, individually and on behalf of their minor child, C.M.** | ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No.:  2:18-cv-01276-JS** |
| **vs.** | ) | |
| | ) | |
| **NEWSWEEK MEDIA GROUP, LTD, t/a NEWSWEEK, LLC and/or NEWSWEEK, INC. and/or NEWSWEEK** | ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE
AMENDED COMPLAINT**

Plaintiffs hereby respond to the Motion to Dismiss filed by Defendant Newsweek, LLC and for all of the reasons set forth in the accompanying Memorandum of Law, respectfully request this Honorable Court to deny said Motion.  Specifically, and as delineated in the Memorandum of Law, the Defendant's Motion to Dismiss fails for at least the following reasons:

1.  The Defendant's Motion is predicated upon impermissible and highly disputed "facts" clearly beyond the scope of the Amended Complaint, which have not been the subject of any discovery or that are completely irrelevant to the dispute;

2.  It is impossible (if not absurd) on this factual record, no less after any discovery, for this Honorable Court to conclude that the 12-year-old Plaintiff was or is a limited purpose public figure who influenced the Presidential election in any impactful way;

3.  The Motion does not ever define the "public controversy" at issue, and instead, muddles its way through a series of non-specific allegations which somehow point to

the conclusion that a 12-year-old is somehow impactful in this deliberately vague, obtuse and undefined public controversy;

4. Actual malice has been properly alleged in the Amended Complaint and will obviously be the subject of discovery; therefore, any discussion of actual malice is entirely premature without discovery;

5. In Pennsylvania, it is clearly defamatory to impute "sexual abuse" to anyone, and the Defendant's argument is flatly wrong;

6. In Pennsylvania, Plaintiffs aver that it is defamatory to impute "raw racism" to anyone for the reasons clearly set forth more fully below; and

7. The Plaintiffs/parents' claims are legitimate as a result of the inferences set forth and intended by Newsweek that C.M.'s parents allowed their child to be "weaponized" for the purpose of promoting "raw racism" and "sexual abuse."

WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny the Motion to Dismiss, together with any further relief which this Court deems just and appropriate under the circumstances.

<div style="margin-left:40%">

Respectfully submitted,

**THE BEASLEY FIRM, LLC**

BY:    _/s/ Dion G. Rassias_
DION G. RASSIAS, ESQUIRE
Attorney I.D. No.: 49724
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
(215) 592-8360 (facsimile)

</div>

DATED:  June 4, 2018

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRIAN McCAFFERTY and MELISSA McCAFFERTY, individually and on behalf of their minor child, C.M.** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) **No.: 2:18-cv-01276-JS** | |
| **vs.** ) | |
| ) | |
| **NEWSWEEK MEDIA GROUP, LTD, t/a NEWSWEEK, LLC and/or NEWSWEEK, INC. and/or NEWSWEEK** ) **JURY TRIAL DEMANDED** | |
| ) | |
| **Defendant.** ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

**THE BEASLEY FIRM, LLC**

DION G. RASSIAS, ESQUIRE
Attorney I.D. No.: 49724
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
(215) 592-8360 (facsimile)

*Attorney for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

ARGUMENT ................................................................................................................... 1

    I.   Defendant's Motion Is Predicated Upon Impermissible And Highly Disputed
        "Facts" Clearly Beyond The Scope Of The Amended Complaint ................................... 1

    II.  C.M. Is Not A Limited Purpose Public Figure ................................................. 1

    III.  Plaintiffs' Amended Complaint Sufficiently Alleges Malice ........................... 4

    IV.  In Pennsylvania, It Is Clearly Defamatory To Impute "Raw Racism"
        And "Sexual Abuse" To C.M. And His Parents ........................................... 6

    V.  C.M.'s Parents Are Defamed And Placed In False Light ................................ 10

## **TABLE OF AUTHORITIES**

**CASES**

Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163 (2d Cir. 2000)........................................5

Clemente v. Espinosa, 749 F.Supp. 672 (E.D.Pa. 1990).........................................................7

Cosgrove Studio and Camera Shop, Inc. v. Pane, 182 A.2d 751, 753 (Pa. 1962)............................9

Dunlap v. Phila. Newspapers, Inc., 448 A.2d 6 (Pa.Super. 1982)............................................10, 11

Garrison v. Louisiana, 379 U.S. 64 (1964) ...............................................................................5

Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) ....................................................................4

Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc., 489 A.2d 1364 (Pa.Super. 1985)...............11

Harte-Hanks Communications, Inc., 491 U.S. 657 (1989) ......................................................5

Jodek Charitable Trust, R.A. v. Vertical Net Inc., 412 F.Supp. 2d 469 (E.D.Pa. 2006).................8

Joseph v. Scranton Times L.P., 959 A.2d 322 (Pa.Super. 2008)...............................................2

Jungclaus v. Waverly Heights, Ltd., 2018 U.S. Dist. LEXIS 59635 (E.D.Pa. Apr. 9, 2018) .........9

Krajewski v. Gusoff, 53 A.3d 793 (Pa.Super. 2012) ..............................................................10

Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181 (Pa.Super. 1988) ......................................10

Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287 (D.C. Cir. 1988) ...............................5

Livingston v. Murray, 612 A.2d 443 (Pa.Super. 1992) ...........................................................11

MacElree v. Phila. Newspapers, 674 A.2d 1050 (Pa. 1996) ................................................8, 9

Malia v. Gen. Elec. Co., 23 F.3d 828 (3d Cir. 1994) ..............................................................1

Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072 (3d Cir. 1985).........................2

Masson v. New Yorker Magazine, Inc., 501 U.S. 496 (1991) ..................................................6

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) .................................10

McDowell v. Paiewonsky, 769 F.2d 942 (3d Cir. 1985) ..........................................................3

Menkowitz v. Peerless Publ'ns, Inc., 176 A.3d 968 (Pa.Super. 2017) .......................................... 10

Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634 (3d Cir. 2000) ................................................ 8

New York Times Co. v. Sullivan, 376 U.S. 254 (1964) ........................................................... 3, 4, 5

Pelagatti v. Cohen, 536 A.2d 1337 (Pa.Super. 1987) .................................................................... 11

Sarkees v. Warner-West Corp., 37 A.2d 544 (Pa. 1944) ............................................................... 10

Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069 (3d Cir. 1988) ............................................... 5

Sprague v. ABA, 276 F. Supp. 2d 365 (E.D. Pa. 2003) ................................................................. 11

St. Amant v. Thompson, 390 U.S. 727 (1968) .................................................................................. 5

Thomas Merton Center v. Rockwell International Corp., 442 A.2d 213 (Pa. 1981) ................... 11

Tucker v. Phila. Daily News, 848 A.2d 113 (Pa. 2004) .................................................................. 6

U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC, 519 F.Supp. 2d 515 (E.D.Pa. 2006)................. 1

**STATUTES**

18 Pa.C.S. § 3101, et seq. ............................................................................................................... 7

18 Pa.C.S. § 6312(d) ......................................................................................................................... 7

42 Pa.C.S.A. § 9799.14 ..................................................................................................................... 7

18 U.S.C. § 2241 through 2244 ........................................................................................................ 7

**OTHER AUTHORITIES**

17.100 Defamation, Defamatory Meaning, Pa. Sugg. Std. Civ. Jury Instr., 4th Ed., Vol. I
(2016) .................................................................................................................................................. 8

Merriam-Webster.com. 2018. https://www.merriam-webster.com (May 22, 2018) ...................... 7

Restatement (Second) of Torts § 559 ............................................................................................... 9

Restatement (Second) of Torts § 570; .............................................................................................. 7

**ARGUMENT**

### I. Defendant's Motion Is Predicated Upon Impermissible And Highly Disputed "Facts" Clearly Beyond The Scope Of The Amended Complaint

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Honorable Court must accept as true all facts alleged in the Complaint. Malia v. Gen. Elec. Co., 23 F.3d 828, 830 (3d Cir. 1994). Dismissal for failure to state a claim is only appropriate when it clearly appears that the plaintiff cannot prove any facts in support of the claim. U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC, 519 F.Supp. 2d 515, 520 (E.D.Pa. 2006) (citations omitted).

Here, Defendant introduces new, improper "facts" which are clearly beyond the four corners of the Amended Complaint, have not been investigated in discovery and are completely inappropriate at this time. Examples of the Defendant's improper and highly disputed factual arguments include the allegations that: (1) the article does not refer to Plaintiff-parents; (2) C.M. is a public figure and influenced the Presidential Election; (3) "[s]ome of the statements do not mean what the [Plaintiffs] claim they mean;" (4) the article is not defamatory; (5) the article contains only opinions; (6) the statements are not false; and (7) the article refers not to C.M., despite his picture on the top, but other kids and adults (which Defendant also frivolously alleges does not include Plaintiff-parents).

Obviously, these inappropriately raised issues are questions of fact, or at a minimum mixed facts and law, without any discovery. Plaintiffs' Amended Complaint is well-pled.

### II. C.M. Is Not A Limited Purpose Public Figure

For C.M to be a limited purpose public figure, he must be "attempting to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants.

In undertaking this examination, a court must look through the eyes of a reasonable person at the facts taken as a whole." <u>Joseph v. Scranton Times L.P.</u>, 959 A.2d 322, 339 (Pa.Super. 2008).[1] Defendant must prove that this 12-year old child impactfully interjected himself into controversy. [2] With over 120 million votes cast, arguing that a single pre-teen, through one video, was able to effect the race/controversy is ludicrous. "In determining whether a defamation Plaintiff is a limited purpose public figure, the Court must consider (1) whether the alleged defamation involves a public controversy, **and (2) the nature and extent of Plaintiff's involvement in that controversy.**" <u>Marcone v. Penthouse Int'l Magazine for Men</u>, 754 F.2d 1072, 1082 (3d Cir. 1985) (emphasis added).

Defendant's Motion to Dismiss alleges that by C.M. expressing his views he somehow impactfully injected himself into the undefined public controversy. [Dkt. #22-1 at 10]. C.M.'s role in the Presidential Election and its aftermath is literally undetectable. C.M. could not even vote in the election (in essence the ultimate determination of "impactful"), and only briefly advocated for Mr. Trump with his video on an unrelated topic, the NFL.  <u>See</u> p. 4, <u>infra</u>. C.M.'s overall effect is beyond minuscule when compared to all the other infinite electoral forces at work, i.e., nearly $2 billion spent by the two campaigns. Even generously, albeit unbelievably, assuming the Alex Jones segment, the Laura Ingraham photo-op and 7 million view videos were "influential" to someone, to call this a "major impact"[3] on a national Presidential Election and its aftermath is clearly unsustainable and desperate. Defendant chiefly argues the influence of 12-year old C.M. is evident from his 7 million YouTube views and one appearance on Alex Jones'

---

[1] While <u>Joseph</u> has a complicated subsequent appellate history, nothing changed this holding.

[2] Curiously, Defendant never defines the "controversy;" yet another reason to deny the Motion to Dismiss.

[3] <u>Joseph</u>, 959 A.2d at 339.

show.  Yet, of the 7 million views, it is impossible now to determine how long the "views" were, or how many of those views were predicated upon anything C.M. said or did, as opposed to tagalong views from Laura Ingram and Alex Jones, which obviously C.M. never interjected himself into. Defendant plays fast and loose with its regurgitation of the "7 million views" without the benefit of any discovery.[4] Defendant erroneously tries to draw the inference that C.M.'s total views created some sort of undefined impact; Defendant does not even admit that this video allegedly creating limited purpose public figure status was not made until nearly a year after Mr. Trump was elected, and was based on a different factual topic.  Thus, for policy reasons, determining that any person on social media, who comments on a Presidential Election (in the context of a video on another topic, no less), should be considered a limited purpose public figure for defamation cases would set a mind-boggling and chilling precedent, and that is precisely why Defendant is relegated to relying principally upon very old, pre-Internet case law. Such strategies designed to escape liability for poor, substandard journalism, do not "materially advance society's interest in 'uninhibited, robust, and wide-open' debate on public issues." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).

Defendant relies on one case decided long before social media was a factor, and even prior to the inception of the Internet, the 33-year old decision of McDowell v. Paiewonsky, 769 F.2d 942, 947 (3d Cir. 1985), as establishing a rule that any person inviting any commentary or soliciting attention becomes a limited purpose public figure. Extending this stale reasoning to the

---

[4] The most viewed video on YouTube at present has 2 billion more views than people who have access to the internet. Therefore, view count evidence is hollow in supporting Defendant's argument and in fact advances Plaintiffs' assertion. Alex Jones is a conspiracy theorist hosting a talk radio show on the internet. His reach is often exaggerated even by himself. To suggest that an appearance on Jones' show is somehow indicative of fame or celebrity status or even minor notoriety is preposterous. In fact, the Alex Jones interview of C.M. at present has barely over 23,000 views.

Internet is unprecedented, foolhardy and wildly inconsistent with more recent, reliable cases. Any person on social media could be classified as inviting commentary; thus, in Defendant's warped world any social media post magically transforms the original poster into a limited purpose public figure for whatever topic they post on. When Defendant's argument is equated to the physical world, any child who puts up a lawn sign supporting a Judicial or school board candidate would be inviting commentary or obtaining attention.[5] Arguing that all one needs to do to become a limited purpose public figure is to seek attention is such a low threshold it becomes meaningless. Defendant ignores the more recent <u>Joseph</u> opinion while it poorly manipulates the ill-fitting, stale and easily distinguishable <u>McDowell</u> decision.

Further, the "7 million view video" that Defendant cites is actually <u>a video commenting on the NFL anthem boycott</u>, and the NFL boycott is <u>not</u> the public controversy at issue here. This unrelated controversy cannot suddenly be transposed upon the present controversy for purposes of establishing the "major impact" necessary to establish a limited purpose public figure.[6]

**III.    <u>Plaintiffs' Amended Complaint Sufficiently Alleges Malice</u>**

Actual malice means writing a piece "with knowledge that it was false or with reckless disregard of whether it was false or not." <u>New York Times Co.</u>, 376 U.S. at 280. Here, Newsweek very obviously wrote the article knowing certain key assertions were patently false, and approached its story with a reckless disregard of whether those claims were false. The

---

[5] Then, Defendant would have us believe, if the lawn sign is visible from the Turnpike, with 200 million yearly drive-bys in 2012 – obviously greater now – there would be 200 million "views" of this same lawn sign therefore making that child, under Defendant's argument, a limited purpose public figure.  <u>See</u> Ex. "A."

[6] This again is troubling in the Internet age. Where a person makes one piece of online content and then separately speaks about a completely different topic, they cannot be said to be a limited purpose public figure for Topic B on any alleged "fame" derived from commentary on Topic A. <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 352 (1974).

Complaint is not 'merely buzzwords' as Defendant nonchalantly attempts to characterize, but cites legal standards relevant to the case. [Dkt. #22-1 at 11]. To show reckless disregard for the truth or falsity of a statement, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." Id. This is a subjective inquiry that requires "sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of…probable falsity.'" Harte-Hanks Communications, Inc., 491 U.S. 657, 688 (1989) (quoting Garrison v. Louisiana, 379 U.S. 64, 74 (1964)). This is critical here because prior to discovery, there has not yet been the opportunity for Plaintiffs to confirm what appears, on its face, should be Defendant's logical doubt about the story.

The Court has said that "objective circumstantial evidence can suffice to demonstrate actual malice" and can even "override defendants' protestations of good faith and honest belief that the report was true." Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1090 (3d Cir. 1988) (citing St. Amant v. Thompson, 390 U.S. 727, 732 (1968)). A court may infer actual malice from objective facts that provide evidence of "negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." Id. at 1090 n.35 (citations omitted). Actual malice can be shown "[t]hrough the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence[.]" Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 183 (2d Cir. 2000) (quoting Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287, 1293 (D.C. Cir. 1988)). Defendant acted negligently and grossly departed from professional journalistic standards in not reaching the subject or his parents for comment. This supports the argument that the sources for the article were dubious at best, and Defendant knew with high likelihood that its story about C.M. was false. Defendant claims no reasonable person would

believe a 12-year-old was in an army that supported racism or sexual assault, and yet Defendant published those exact words. [Dkt. #22-1 at 17]  It is dubious advocacy to suggest there is no possible evidence proving doubt in the publisher's mind about the veracity of the actual written words.

There are many instances where the U.S. Supreme Court "and this Court have declined to dismiss a pleading prior to trial because a factual dispute with regard to a component of actual malice made it premature to do so." Tucker v. Phila. Daily News, 848 A.2d 113, 130 (Pa. 2004) (citing Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 521 (1991) (reversing grant of summary judgment; "at this stage, the evidence creates a jury question whether [the writer of the article] published the statements with knowledge or reckless disregard" of the falsity of the statements). In reality, even the Motion(s) to Dismiss already confirm that Defendant **knew** that C.M. was not part of any army and never supported or condoned "sexual assault" or "raw racism;" yet, Defendant still wrote and therefore imputed those words. This obvious falsity already exceeds the required threshold.

## IV.    In Pennsylvania, It Is Clearly Defamatory To Impute "Raw Racism" And "Sexual Abuse" To C.M. And His Parents

"The kids are being weaponized…
when, in fact, they are defending raw racism and sexual abuse."

See article attached as Exhibit "A" to Plaintiffs' Amended Complaint.

Against the words above, Newsweek frivolously contends that its language does not impute defending raw racism and sexual abuse.  Obviously, it does, and the words say so.  "The kids" clearly include C.M., and Defendant's denial is even more insane when C.M.'s picture is above the article.  For Newsweek to claim that the reference is to "other kids," (pp. 4-5, 15-20 of its Brief) but not C.M., is insulting.  Then, the very next clause specifically states that "they" –

6

i.e., the kids – are defending raw racism and sexual abuse.  The plain language of what Newsweek wrote defeats all of its contorted factual arguments set forth in its frivolous Motion to Dismiss.  At the risk of oversimplifying the analysis, if the article is not about C.M., why use his picture instead of the alleged "other kids" the article was about?  [Dkt. #22-1 at 4-5, 15-20]  While Newsweek may explain away now what it wrote through a flimsy, illogical backtracking of its words, all Newsweek really does, at best, is highlight exactly how this case ultimately poses a jury question.

The definition of impute is to "credit to a person or a cause; attribute."[7]  Here, the Defendant has clearly imputed, by its words, sexual abuse and racism to the minor-Plaintiff.  Certainly, by inference, the article further suggests that the Plaintiff-parents have allowed their child to be weaponized to defend racism and sexual abuse.

There can be no credible dispute that in Pennsylvania, "sexual abuse" is a crime, see e.g. 18 Pa.C.S. § 3101, et seq.; 18 Pa.C.S. §6312(d); 42 Pa.C.S.A. § 9799.14; 18 U.S.C. § 2241 through 2244.  It is defamatory to impute a criminal offense to anyone.  Restatement (Second) of Torts § 570; Clemente v. Espinosa, 749 F.Supp. 672, 677 (E.D.Pa. 1990).

Pennsylvania law is clear:

> A communication is defamatory if any portion of it tends to so harm the reputation of that person as to lower him or her in the estimation of the community or to deter third persons from association or dealing with him or her.
> * * *
> A communication that states or implies that a person or entity has committed a crime is defamatory.
> * * *
> In deciding whether the communication was defamatory, you should consider the message the communication would send to the average people who could have been expected to receive it.  This means you should consider the innuendoes and implications of

---

[7] Merriam-Webster.com. 2018. https://www.merriam-webster.com (May 22, 2018).

> what was said, as well as inferences the recipients would have
> drawn from what may not have been said.   You should also
> consider the context in which the allegedly defamatory statement
> was made.
>
> <div align="center">* * *</div>
>
> A communication or any portion of it is defamatory if in context its
> stated or implied meaning is defamatory.

17.100 Defamation, Defamatory Meaning, Pa. Sugg. Std. Civ. Jury Instr., 4th Ed., Vol. I (2016).

Defendant's imputation of "raw racism" to the three (3) Plaintiffs fares no better. Plaintiffs could find no Pennsylvania Supreme Court opinions that hold that calling anyone a "racist" is not defamatory; only the trial courts and the intermediate appellate courts have generally touched the topic.   In fact, missing from the Defendant's understandably sanitized Brief at pp. 17-18 is that the Pennsylvania Supreme Court has specifically stated that "it <u>cannot</u> be said that every such accusation [of racism] is not capable of defamatory meaning as a matter of law." <u>MacElree v. Phila. Newspapers</u>, 674 A.2d 1050, 1055 (Pa. 1996).  One of this Court's functions is to appropriately predict what the Pennsylvania Supreme Court would do when confronted with a specific situation, in this case in 2018, and decide whether imputing racism to someone is defamatory.  <u>Nationwide Mut. Ins. Co. v. Buffetta</u>, 230 F.3d 634, 637 (3d Cir. 2000) ("Because there was no reported decision by the Pennsylvania Supreme Court or any other Pennsylvania court addressing the precise issue before it, it was the duty of the District Court to predict how the Pennsylvania Supreme Court would interpret [the issue] presented."); <u>see</u> <u>also</u>, <u>Jodek Charitable Trust, R.A. v. Vertical Net Inc.</u>, 412 F.Supp. 2d 469, 474 (E.D.Pa. 2006) ("When the state's highest court has not addressed the precise question presented, a federal court must predict how the state's highest court would resolve the issue." (citations omitted)).

**<u>Plaintiffs suggest that no court, by today's standards, would ever find that imputing racism to anyone is not defamatory.</u>**  Indeed, this Court agrees.  In a recent decision, this Court

<div align="center">8</div>

found that the term "racist" has a "deplorable connotation in American culture" and thus, is disparaging to a person's character.  Jungclaus v. Waverly Heights, Ltd., 2018 U.S. Dist. LEXIS 59635, at *13 (E.D.Pa. Apr. 9, 2018).

To be clear, Newsweek now absurdly advances the position that imputing racism to anyone, no less a 12-year-old child, is not defamatory in 2018. Yet, everyone knows that imputing racism in 2018 is defamatory because, by its legal definition, defamation is harm to the reputation of a person so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her. Restatement (Second) of Torts § 559; see also, Cosgrove Studio and Camera Shop, Inc. v. Pane, 182 A.2d 751, 753 (Pa. 1962).  The Pennsylvania Supreme Court specifically held that "[a] charge of racism clearly could have such an effect on the individual so charged.  Where such a possibility exists, it is up to the jury as fact finder to determine its existence."  MacElree, 674 A.2d at 1055.  By today's standards, being imputed as a racist certainly lowers an individual in the estimation of his or her community and further, obviously deters third persons from associating with him.[8]  Newsweek, and its lawyers, continue to get it wrong and should be admonished for even advancing such a frivolous argument.[9]

---

[8] By way of example only, consider Donald Sterling, the former owner of the Los Angeles Clippers, who was recently banned from the NBA for life, fined $2.5 million and literally forced to sell his $2 billion basketball team after a recording of him surfaced telling his girlfriend "It bothers me a lot that you want to broadcast that you're associating with black people.  Do you have to?  The little I ask you is not to promote it...and not to bring them to my games," because his fellow owners and league sponsors did not want to associate or deal with him on that racial basis alone.  See Ex. "B" attached hereto.  Obviously, there are piles of other such instances about how having anything to do with racism, in today's world, is clearly defamatory.  Again, Newsweek and its lawyers still continue to get it wrong.

[9] Sadly, Ballard Spahr even asked this Court for more pages in its Brief to raise points like this.

**V.      C.M.'s Parents Are Defamed And Placed In False Light**

The current federal standard for pleadings is to view the facts in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Case law clearly asserts defamation by implication. Here, the parents of C.M. are defamed and placed in false light by the implication that they have allowed their child to be "weaponized" for the purpose of promoting "raw racism" and "sexual abuse." A recent decision from the PA Supreme Court explains this principle of defamatory implication and innuendo:

> Defamation by implication is an acknowledgement that, in some instances, innocent words, i.e., words not defamatory on their face, may create a defamatory innuendo due to the context in which the statements are issued. Innuendo is the insinuation or implication that arises from the literal language used in a statement or set of comments.

Menkowitz v. Peerless Publ'ns, Inc., 176 A.3d 968, 982 (Pa.Super. 2017).

Such words are actionable as defamation where the innuendo is both defamatory and false because the implications that may be deemed defamatory are derived from the meanings ascribed to the language used and the manner in which the language is used when looking at the statement as a whole. Id. at 984 (citing Dunlap v. Phila. Newspapers, Inc., 448 A.2d 6, 15 (Pa.Super. 1982)). Similarly, false light invasion of privacy provides a cause of action not merely for publications that are provably false, "but also for those that although true, are selectively publicized in a manner creating a false impression." Krajewski v. Gusoff, 53 A.3d 793, 806 (Pa.Super. 2012) (citing Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181, 1189 (Pa.Super. 1988)). The legal test to be applied to determine whether a statement is defamatory by implication is whether the challenged language can "fairly and reasonably be construed" to imply the defamatory meaning alleged by a Plaintiff. Sarkees v. Warner-West Corp., 37 A.2d 544, 546 (Pa. 1944). The "innuendo must be warranted, justified and supported by the publication."

Livingston v. Murray, 612 A.2d 443, 449 (Pa.Super. 1992) (quoting Thomas Merton Center v. Rockwell International Corp., 442 A.2d 213, 217 (Pa. 1981)).

In situations "where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, **it is for the jury** to determine if the defamatory meaning was understood by the recipient." Pelagatti v. Cohen, 536 A.2d 1337, 1345 (Pa.Super. 1987) (emphasis added) (citing Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc., 489 A.2d 1364, 1368 (Pa.Super. 1985)), appeal denied, 548 A.2d 256 (Pa. 1988). A publisher may be liable for the implications of what he has said or written, not merely the specific literal statements made. Dunlap 301 Pa.Super. at 492. The Third Circuit then provided the following illustrious example of its point, "for example, that a man and a woman married, but not to each other, spent a night together in a hotel room, will be interpreted as an assertion of the pair engaged in sexual activities, because the average reader will assume that "they sayeth not a pater noster there." Id. The innuendo created by Newsweek is no less repulsive for any parent here.

At best, Defendant's argument confirms that this case raises the issue for a jury to decide whether readers of the article interpreted it in its defamatory sense. This Court has already held that there was sufficient evidence for a jury to determine that when a publisher employed the label "lawyer-cum-fixer," it either deliberately cast this description in an ambiguous light in the hope of insinuating a false import to the reader, or that it knew or recklessly disregarded the possibility that its words would be interpreted by the average reader as false statements of fact. Sprague v. ABA, 276 F. Supp. 2d 365, 377 (E.D. Pa. 2003).  As Pennsylvania law dictates, it is now a question for the jury whether readers of the Newsweek article interpreted it in its defamatory sense.

It is the Defendant's burden to prove that its publication could not possibly, to any reasonable reader, impute the defamatory innuendo that the parents of C.M. allowed their child to be "weaponized," for the purpose of promoting "raw racism and "sexual abuse." This is because there is sufficient evidence for a jury to determine that when Defendant published its article it either deliberately cast this description in an ambiguous light (attributing it to "the adults") in the hope of insinuating a false import to the reader, or that Defendants knew or recklessly disregarded the possibility that its words would be interpreted by the average reader as false statements of fact about the parents.

In sum, these are the multitudinous reasons why the Defendant's arguments are completely without merit.

<div style="text-align:center">Respectfully submitted,</div>

**THE BEASLEY FIRM, LLC**

BY:     _/s/ Dion G. Rassias_
DION G. RASSIAS, ESQUIRE
Attorney I.D. No.: 49724
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
(215) 592-8360 (facsimile)

DATED:  June 4, 2018

# EXHIBIT "A"

# PENNA TURN PIKE *Fast Facts*

## Length of Turnpike
Delaware River to Ohio ............................................. 359 miles
Northeastern Extension ............................................. 110 miles
Western Expansions .................................................. 83 miles
  Expansions Includes:
  • Beaver Valley Expressway     • Mon/Fayette
  • Greensburg Bypass            • Southern Beltway
Total Turnpike Miles ................................................ 552 miles
Total Lane Miles ..................................................... 2,416 miles

## Number of Fare Collection Facilities
Delaware River to Ohio State Line ............................... 32
  (Includes E-ZPass Only Interchanges: Route 29, Virginia Drive, Street Road)
Northeastern Extension ............................................. 10
Western Expansions .................................................. 25
  Expansions Includes:
  • Beaver Valley Expressway     • Mon/Fayette Expressway
  • Greensburg Bypass            • Southern Beltway
Total Fare Collection Facilities .................................. 67

## Number of Service Plazas
Delaware River to Ohio State Line ............................... 15
Northeastern Extension ............................................. 2
Total Service Plazas ................................................ 17

## Number of Maintenance Facilities
Maintenance Buildings .............................................. 22
Tunnels ............................................................. 5
Total Maintenance Facilities ....................................... 27

## Average Traffic Volume
Total Vehicles per Calendar Year (2012) ........................ 192,581,742
Vehicles per Day (2012) ............................................ 526,180
Commercial Vehicles per Day (2012) ................................ 67,957
Vehicles in 1941 (First Full Year of Operation) ................... 2,400,000
Average System-Wide Vehicles per Day (1941) ....................... 6,575

## Traffic Composition
Passenger Vehicles ................................................. 87.1%
Commercial Vehicles (Trucks/Buses) ................................ 12.9%

## Employee Breakdown
Non-Union .......................................................... 498
Total Union ........................................................ 1,639
  • Union Toll Collectors .......................................... 622
  • Union Maintenance Workers ...................................... 662
Total Employees .................................................... 2,137




Left to Right:
• New portal of Turnpike tunnel being built.
• Grand Opening: rows of vehicles line up at the "ticket offices."
• Early-Style Turnpike Tollbooth.

## Turnpike History

• Original, 160-mile PA Turnpike from Middlesex to Irwin was built in just two years (1938-1940).
• Designed from a motorist's point-of-view, the Turnpike was considered an engineering marvel.
• It would inspire the Interstate system 15 years later with features and standards such as:
  - Consistent Design: Curves/Slopes/Lane Width/Median Width
  - Limited Access: On and Off at Selected Points Only
  - No Cross Streets, Stop Signs, Red Lights
  - All Roads/Rails either Under or Over Turnpike
  - No Speed Limit (Initially)
• Grand Opening of the "Tunnel Highway" was midnight on Oct. 1, 1940.
• People came from all over and waited days to be the first Turnpike motorist; traffic was backed up at entrance.
• The Original "Pike" Featured:
  - 11 Toll Plazas and 11 Service Stations
  - 285 Bridges and Seven Tunnels

## Total Reconstruction

| Year | Total Miles | Location | Total Cost | # of Lanes |
|------|-------------|----------|------------|------------|
| 2000 | 5.23 miles | Milepost 94 - 99 | $ 31 million | 5 |
| 2001 | 13.09 miles | Milepost 186 - 199 | $ 58 million | 4 |
| 2002 | 9.63 miles | Milepost 75 - 85 | $ 75 million | 4 |
| 2005 | 1.78 miles | Milepost 38 - 40 | $ 18 million | 4 |
|      | 9.00 miles | Milepost 85 - 94 | $ 74 million | 4 |
|      | 12.53 miles | Milepost 109 - 121 | $ 74 million | 4 |
| 2006 | 2.92 miles | Milepost 331 - 333 | $ 28 million | 6 |
| 2008 | 2.96 miles | Milepost 124 - 128 | $ 40 million | 5 |
|      | 2.55 miles | Milepost 245 - 247 | $155 million | 6 |
|      | 5.32 miles | Milepost 326 - 331 | $172 million | 6 |
| 2009 | 9.29 miles | Milepost 0 - 10 | $135 million | 6 |
|      | 4.37 miles | Milepost 210 - 215 | $ 76 million | 6 |
| 2010 | 1.93 miles | Milepost 48 - 50 | $205 million | 6 |
| 2011 | 7.78 miles | Milepost 67 - 75 | $175 million | 6 |
| 2012 | 6.42 miles | Milepost 31 - 38 | $131 million | 6 |
|      | 5.01 miles | Milepost 215 - 220 | $ 51 million | 6 |
|      | 0.41 mile | Milepost 319 - 320 | $ 48 million | 4 |
|      | 1.80 miles | Milepost A73.5 - A 75.3 | $102 million | 4 |
| Totals | 102.02 miles | Statewide | $1.65 Billion | |

# EXHIBIT "B"

GET TIME MAGAZINE FOR AS LOW AS **58 ¢** PER ISSUE    REDEEM MY OFFER    ✕

# TIME

## NBA Bans Donald Sterling 'For Life' After Racist Rant

By **DAN HIRSCHHORN** and **SEAN GREGORY** April 29, 2014

Donald Sterling, the Los Angeles Clippers owner who has been at the center of a national firestorm since a recording emerged last week depicting him making racist comments, was punished Tuesday with a lifetime ban from the NBA and a $2.5 million fine.

In his first major decision since assuming leadership of the league, NBA Commissioner Adam Silver handed down the unprecedented punishment of banning an owner from his own team. Silver said Sterling will be prohibited from attending games, practices, league owner meetings, or participating in team or league business in any way. Silver said he would ask the other owners to exercise their authority to force a sale of the team—a move that could set up a heated legal battle.

"I am banning Mr. Sterling for life," Silver said at a news conference in New York. He said the lifetime ban was effective immediately and would remain so regardless of whether Sterling sells the team.

Sterling did not immediately comment Tuesday. The recording, which was first published by *TMZ* over the weekend, depicted him chastising his then-girlfriend for posting a photo of herself alongside a friend and NBA legend Magic Johnson to Instagram. During the conversation, Sterling told his girlfriend not to bring black people to Clippers games.

"It bothers me a lot that you want to broadcast that you're associating with black people. Do you have to?" Sterling said in the recording. "You can sleep with [them]. You can bring them in, you can do whatever you want. The little I ask you is not to promote it on that ... and not to bring them to my games."

Silver said Sterling acknowledged during the league's investigation into the recording that it was his voice on the tape. The league's investigation, Sterling said, determined that "the man whose voice is heard on the recording ... is Mr. Sterling, and that the hateful opinions voiced by that man are those of Mr. Sterling.

"The views expressed by Mr. Sterling are deeply offensive and harmful," Silver added. "That they came from an NBA owner only heightens the damage and my personal outrage. Sentiments of this kind are contrary to the principles of

inclusion and respect that form the basis our diverse, multicultural and multiethnic league." GET TIME MAGAZINE FOR AS LOW AS **58¢** PER ISSUE REDEEM MY OFFER ✕

The ban comes in the midst of a playoff run by the team. The Clippers are tied at two games apiece in a first-round, best-of-seven series against the Golden State Warriors, with game 5 set for Tuesday night in Los Angeles. The distracted Clippers were crushed in game 4, 118-97, after turning their warmup jerseys inside-out before the game as a show of protest.

The Clippers didn't immediately comment Tuesday, but the team changed its homepage to simply declare: "We Are One." The team also wrote "#WeAreOne #Clippers" on its Twitter feed.

Silver said he's hopeful both the team and the league can move past the controversy.

"My message to the Clippers fans is this league is bigger than any one owner," he said.

Current and former players and coaches—including Johnson, Michael Jordan and Clippers Coach Doc Rivers—and even President Barack Obama had fiercely criticized Sterling's comments in the days after their disclosure. Silver received quick praise Tuesday for his decision.

"Commissioner Silver showed great leadership in banning LA Clippers owner Donald Sterling for life," Johnson, who is reportedly interested in buying the team, said on Twitter.

"I agree 100% with Commissioner Silvers findings and the actions taken against Donald Sterling," Dallas Mavericks owner Mark Cuban said on Twitter.

Twenty-two of the league's 30 owners would have to vote in favor of forcing a sale. Silver said he hadn't polled the owners, but that "I spoke to several owners and I have their full support." It remains unclear who will assume control of day-to-day operations of the team. Sterling purchased the Clippers for $12 million in 1981, and NBA franchise values are soaring: The small-market Milwaukee Bucks just sold for $550 million. A sale could also compel corporate sponsors that have abandoned the franchise, such as State Farm, Kia Motors, Red Bull, and Virgin America, to return.

Sterling has kept a low profile since the recording emerged. His representatives have neither confirmed nor denied its authenticity. "Mr. Sterling is emphatic that what is reflected on that recording is not consistent with, nor does it reflect his views, beliefs or feelings," the team said in a statement over the weekend. "It is the antithesis of who he is, what he believes and how he has lived his life. He feels terrible that such sentiments are being attributed to him and apologizes to anyone who might have been hurt by them."

Case 2:18-cv-04276-JS Document 23 Filed 05/04/18 Page 25 of 26

The $2.5 million fine against Sterling is a drop in the bucket for a man whose
total net worth is estimated to be $1.9 billion, and who will presumably make
millions if he sells the team.

GET TIME MAGAZINE FOR AS LOW AS **58¢** PER ISSUE    REDEEM MY OFFER    ✕

Silver was under intense pressure to take action. Star players around the league
and other owners, including Michael Jordan of the Charlotte Bobcats and Paul
Allen of the Portland Trail Blazers, had blasted Sterling, and President Barack
Obama even weighed in while traveling in Asia over the weekend. "I have
confidence that the NBA commissioner, Adam Silver, a good man, will address
this," Obama said from Malaysia.

<u>**CERTIFICATE OF SERVICE**</u>

I, Dion G. Rassias, hereby certify that I caused a true and correct copy of the foregoing to

be served via ECF upon:

Michael Berry, Esquire
Ballard Spahr, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599

Matthew E. Kelley, Esquire
Ballard Spahr, LLP
1909 K Street, NW, 12th Floor
Washington, DC  20006

**THE BEASLEY FIRM, LLC**

BY:     <u>/s/ Dion G. Rassias</u>
DION G. RASSIAS, ESQUIRE
Attorney I.D. No.: 49724
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
(215) 592-8360 (facsimile)

DATED:  June 4, 2018