IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN MCCAFFERTY, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No. 18-1276 |
| | : | |
| NEWSWEEK MEDIA GROUP, LTD. | : | |

**MEMORANDUM**

**Juan R. Sánchez, C.J.**　　　　　　　　　　　　　　　　　　　　　　　　　**March 7, 2019**

　　　　Plaintiffs Brian and Melissa McCafferty, on their own behalf and on behalf of their minor son C.M., bring state law claims for defamation and false light invasion of privacy against Defendant Newsweek Media Group, Ltd., arising out of Newsweek's publication of an article (the Article) that mentions C.M. and displays his photo. Newsweek moves to dismiss the claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Because the challenged statements in the Article are incapable of defamatory meaning or placing C.M. or his parents in a false light, Newsweek's motion will be granted.

**BACKGROUND**

　　　　In January 2018, Newsweek published an Article titled "Trump's Mini-Mes" with the tag line: "The alt-right deployed a 12-year-old Trump supporter to interview Roy Moore on the eve of the special Senate election. She's not the only kid in this weird little army." *See* Am. Compl. Ex. A at 2. The Article includes a photo of C.M. holding up a Trump campaign sign that reads "Make America Great Again" and a photo of another minor, M.M., with a Fox News host. *Id.* at 3. The caption accompanying the photos states "JUST KIDDING Both [C.M.], left, and [M.M.], seen here with prime-time Fox News host Laura Ingraham, have gone viral with videos in which they

tout all things Trump."[1] *Id*. at 2. C.M. is mentioned by name four times in the first two paragraphs of the Article, which read as follows:

> Watch [M.M.] or [C.M.], both of them 12, expound about their love of President Donald Trump and the platforms and candidates he endorses (most recently, [M.M.] deployed to Alabama for a cute-if-it-weren't-so-contextually-creepy interview with Senate candidate Roy Moore), and you'll notice that they both speak like Trump. And like him, they seem very comfortable in front of the cameras. Here's M.M. on Trump in a 2017 video interview with Jennifer Lawrence, vice president of the America First Project, a populist-nationalist super PAC: "One of the other reasons I like him is because, and this is my favorite reason: We will build a waaaallll on our southern borders. And Mexico, no buts about it, Mexico will paaaay for the wall." Or [C.M.], to Infowars's Alex Jones, last October: "By the way, I saw your interview with Megyn Kelly; you got her good. You got her good. She thought she was going to make a fool of you, but you turned it around, and you proved her to be a liar."
>
> Both instances demonstrate how some Trump supporters are recruiting children as spokespeople. Jones, once he got done digressing to his 12-year-old guest about Kelly's hotness, hailed [C.M.] as part of the new wave of resistance to the "globalists"—a term the Anti-Defamation League considers an anti-Semitic dog whistle. "These kids are being weaponized," says Todd Gitlin, professor of journalism and sociology at Columbia University. He says the [M.M.] and [C.M.] interviews "camouflage" positions of the hard right "as feel-good sweetness and light, when, in fact, they are defending raw racism and sexual abuse."

*Id*.

C.M. is not mentioned again in the Article, which focuses largely on M.M.'s conservative activism. *See id*. at 2-3. The Article includes additional commentary from Professor Gitlin and others, and concludes with the following quote from Gitlin:

> These kids are reveling in the chance to show off . . . . They're getting the chance to be little celebrities. If a kid is . . . reading chapter and verse a text written by somebody else, and is circumventing grown-up questions, then I think that's bait-and-switch politics.
>
> There's a sinister quality to this. Kids are being seduced with the promise of being celebrities. In this case, the instigators are recruiting for a sort of boys' and girls' auxiliary, for what they believe to be a sacred crusade.

---

[1] Although the Article refers to both M.M. and C.M. by their full names, the Court refers to both children by their initials because they are minors. *See* Fed. R. Civ. P. 5.2(a)(3); Local R. Civ. P. 5.1.3.

*Id.* at 3.

Following publication of the Article, the McCaffertys, on their own behalf and on behalf of C.M., filed suit against Newsweek. In their Amended Complaint, the McCaffertys assert claims for defamation and false light. Newsweek moves to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]

**DISCUSSION**

The McCaffertys allege the Article contains "facts and innuendo," Am. Compl. 5, that are defamatory of C.M. and themselves and cast all of them in a false light. The crux of the McCaffertys' defamation claim as to C.M. is the Article implies C.M. is part of a "weird little army" and has been "deployed" as a spokesperson for the alt-right to defend racism and sexual abuse. *See* Am. Compl. 5-6, 8-9. They allege these implications also cast C.M. in a false light because they are highly offensive. As for the claims on their behalf, the McCaffertys argue the Article implies they've authorized C.M.'s conduct. Because the challenged statements are

---

[2] To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the plausibility standard "is not akin to a 'probability requirement,'" the complaint must support "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). A complaint which "pleads facts that are merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557). In evaluating a complaint's sufficiency under these standards, a court must first "tak[e] note of the elements a plaintiff must plead to state a claim." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 675). Next, the court should "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, where there are well-pleaded allegations, the court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

3

incapable of defamatory meaning and casting C.M. or the McCaffertys in a false light, the Court will dismiss their claims.

To assert a claim for defamation,[3] a plaintiff must sufficiently allege "[t]he defamatory character of [a] [statement]."[4] *See* 42 Pa. Cons. Stat. § 8343(a). Whether the challenged statement is capable of a defamatory meaning is a threshold issue to be determined by the court. *See Tucker v. Phila. Daily News*, 848 A.2d 113, 123-24 (Pa. 2004). "To determine whether a statement is capable of a defamatory meaning, [the court] consider[s] whether the statement tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Id*. at 124 (internal quotation marks and citations omitted). "Ascertaining whether a communication is capable of a defamatory meaning depends upon what a recipient correctly, or mistakenly but reasonably, understands that the statement was intended to express." *Pierce v. Capital Cities Commc'ns, Inc.*, 576 F.2d 495, 502 (3d Cir. 1978) (internal

---

[3] Under Pennsylvania law, a plaintiff in a defamation action has the burden of proving seven elements:
> (1) [t]he defamatory character of the communication[;] (2) [i]ts publication by the defendant[;] (3) [i]ts application to the plaintiff[;] (4) [t]he understanding by the recipient of its defamatory meaning[;] (5) [t]he understanding by the recipient of it as intended to be applied to the plaintiff[;] (6) [s]pecial harm resulting to the plaintiff from its publication[; and] (7) [a]buse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343(a).

[4] When a plaintiff is a public figure, the plaintiff must also prove a challenged defamatory statement was made with actual malice. *See Gertz v. Robert Welch, Inc*., 418 U.S. 323, 334 (1974) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)). When a plaintiff is a private individual, however, he need only prove the challenged statement was made with negligence. *See Am. Future Sys. Inc. v. Better Bus. Bureau*, 923 A.2d 389, 400 (Pa. 2007) (adopting negligence as the appropriate standard of liability for a defamation claim in Pennsylvania); *see also id.* at 347 (holding "that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual"). Although the parties dispute whether C.M. is a public figure by virtue of actively promoting his political views online and in the media, the Court need not resolve the issue because of its conclusion that the statements are not defamatory.

quotation marks and citation omitted). In making this determination, the Court must consider the challenged statement in context. *See Tucker*, 848 A.2d at 124. To qualify as defamatory, the statement must do more than embarrass or annoy the plaintiff; rather, it must "grievously fracture[] his standing in the community of respectable society." *Id.* (quoting *Scott–Taylor, Inc. v. Stokes*, 229 A.2d 733, 734 (Pa. 1967)).

Not all statements are capable of defamatory meaning. *See Green v. Mizner*, 692 A.2d 169, 174 (Pa. Super. Ct. 1997). Opinions, for example, are not actionable as defamatory. *See id.* ("A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." (internal quotation marks and citation omitted)). Statements of rhetoric and hyperbole are also not actionable as defamatory. *See Smith v. Garber*, No. 03-1424, 2003 WL 21960720, at *1 (E.D. Pa. June 25, 2003) (collecting cases); *see also Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) (the law is "well settled that the use of catchy phrases or hyperbole does not necessarily render statements defamatory that would otherwise be non-actionable"). Statements of fact, however, are actionable as defamatory. *See Green*, 692 A.2d at 174. Innuendo or implication can also be actionable. *See Sarkees v. Warner-West Corp.*, 37 A.2d 544, 546 (Pa. 1944). To determine whether a statement is defamatory by innuendo or implication, the challenged language must "fairly and reasonably be construed to have the meaning" ascribed to it by a plaintiff. *Id.*

The McCaffertys first contend the Article is defamatory of C.M. because it implies he was (1) "deployed . . . by the alt-right" and a "member" of and "spokesperson for the alt-right" who has been "weaponized." *See* Am. Compl. ¶¶ 41(a), (b), (d), (g), (h). The Article cannot "fairly and reasonably be construed" to convey this meaning. The Article refers only to M.M. as having been

5

"deployed" by the alt-right to interview Senate candidate Roy Moore on the eve of a special election, noting the interview was organized by the America First Project, "a populist-nationalistic super PAC." *Id*. Ex. A at 2-3 Although the Article refers to C.M.'s interview with Infowars's Alex Jones, who "caters to the alt-right in his politics and screeds," there is no suggestion C.M. was deployed by the alt-right for the interview. *See id*. Ex. A at 2-3.

The Article also cannot reasonably be understood to suggest C.M. is a "member" of or "spokesperson" for the alt-right. At most, it suggests C.M. is being used or "weaponized" by adults on the political right to "'camouflage' positions of the hard right 'as sweetness and light.'" *Id*. Ex. A at 2. The implication that C.M. may have been taken advantage of by Jones to "camouflage" a political agenda is not defamatory. *Cf. Thomas Merton Ctr. v. Rockwell Int'l Corp*., 442 A.2d 213, 216 (Pa. 1981) (holding that it was not defamatory to imply members of a non-profit organization unwittingly received funding from the Soviet Union to oppose the United States government's B-1 bomber project during the Cold War).

Even if the Article could reasonably be understood to imply C.M. was a "member" of or "spokesperson" for the alt-right, these implications would still not be actionable because they are merely characterizations of C.M.'s political view. "Pennsylvania courts hold that to call a person a name descriptive of his political, economic or sociological philosophies does not give rise to an action for [defamation]." *Balletta v. Spadoni*, 47 A.3d 183, 199 (Pa. Commw. Ct. 2012) (noting that, for example, "accusations of anarchism or of being an anarchist are incapable of defamatory meaning" (citation omitted)); *see also Clark v. Allen*, 204 A.2d 42, 48 (Pa. 1964) (statement that United States Senator's voting record showed "Communist tendencies" was not defamatory as a matter of law). Any suggestion that C.M. is a supporter or member of the alt-right would merely

6

be a description of the political philosophy C.M. publicly espoused by posing for a photo holding a Trump campaign sign or praising Infowars's Alex Jones during his interview with Jones.

The McCaffertys next challenge the Article's allegedly defamatory implication that C.M. is part of a "weird little army." *See* Am. Compl. ¶ 41(c). This phrase, as used in the Article, is a hyperbolic, unverifiable statement that fails to give rise to a claim for defamation. Given that the Article's subject matter concerns children being used to cover up or deliver certain types of political and ideological messages—no reasonable reader would believe C.M., a twelve-year-old boy, was part of any army. This use of this rhetoric is not meant to be taken literally but is merely a catchy phrase designed to draw readers' interest. *See Redco*, 758 F.2d at 972 (affirming district court's classification of "catchy phrases" and "hyperbole" as non-actionable statements under Pennsylvania law).

The McCaffertys also challenge the Article's allegedly defamatory implication that C.M. "supported or defended racism" or sexual abuse and that he is a "spokesperson for . . . racism" or sexual abuse. *See* Am. Compl. ¶¶ 41(e)-(h). These alleged implications rest on the single passage of the Article in which Professor Gitlin comments that children like M.M. and C.M. are being "weaponized." Am. Compl. Ex A at 2. The passage appears after the Article references M.M.'s interview with Roy Moore, who was facing accusations of sexual assault of a minor at the time and C.M.'s interview with Alex Jones, in which Jones used language criticized by the Anti-Defamation League as anti-Semitic. Gitlin goes on to say the [M.M.] and [C.M.] interviews "camouflage" positions of the hard right "as feel-good sweetness and light, when, in fact, they are defending raw racism and sexual abuse." *Id*. at 2. This passage cannot reasonably be understood to accuse M.M. and C.M. of defending racism and sexual abuse. Rather, the concern it raises is that interviews with children are being used by organizations and adults on the "hard right" to

7

"camouflage" their positions "as feel-good sweetness and light." This passage, taken as a whole and in context, does not suggest C.M. or any other child defends racism or sexual abuse.

Even if Professor Gitlin's statements could reasonably be understood to accuse M.M. and C.M. of defending racism and sexual abuse, Gitlin's statement about sexual abuse concerned only M.M.'s in-person interview of Roy Moore, which was described as "creepy" in light of the child sexual assault allegations against him. *See id.* To the extent that Gitlin's statement about racism concerned C.M., Pennsylvania courts have repeatedly held that labeling someone a racist without more, though undoubtedly uncomplimentary, is non-actionable opinion. *Compare Rybas v. Wapner*, 457 A.2d 108, 110 (Pa. Super. Ct. 1983) ("A publication which charges that an individual is actuated by unpleasant or undesirable prejudice may offend his sensitivities, but is not thereby libelous.") and *Jones v. City of Phila.*, 893 A.2d 837, 845 (Pa. Commw. Ct. 2006) (no defamation where public commentary characterized plaintiff's remarks as anti-Semitic), *with MacElree v. Phila. Newspapers, Inc.*, 674 A.2d 1050, 1054-55 (Pa. 1996) (holding a description of plaintiff as "the David Duke of Chester County" could be actionable as "more than a harmless accusation of racism" because it could reasonably be understood as an accusation that plaintiff was engaging in racist conduct, i.e., "abusing his power as the district attorney, an elected office, to further racism and his own political aspirations").

The McCaffertys next argue the Article is defamatory of C.M. because it implies C.M. reads "chapter and verse of a text written by anyone else." *See* Am. Compl. ¶ 41(i). This alleged implication is also an unreasonable interpretation of the Article. The Article does not state C.M. reads "chapter and verse of a text written by anyone else." Rather, the relevant statement appears at the end of the Article and concerns children generally, not C.M. specifically: "If a kid is . . .

8

reading chapter and verse a text written by someone else . . . ." *Id*. Ex. A at 3. The statement itself is also speculative, rendering it non-actionable. *See Green*, 692 A.2d at 174.

The McCaffertys' final challenge as to C.M. is to the allegedly defamatory implication that C.M. "revel[s] in a chance to show off" and has been promised "celebrity status." *See* Am. Compl. ¶¶ 41(j), (k). These statements are based on the final two paragraphs in the Article in which Professor Gitlin states, "These kids are reveling in the chance to show off . . . . They're getting the chance to be little celebrities. . . . There's a sinister quality to this. Kids are being seduced with the promise of being celebrities." *Id*. Ex. A at 3. These statements are not actionable because they are not statements of fact. The statements are Professor Gitlin's opinions regarding children who are used for political purposes and their motivation for engaging in high-profile political activity, i.e., posting videos online, being sponsored by political organizations, giving interviews, etc. *See Heyward v. Credit Union Times*, 913 F. Supp. 2d 1165, 1195 (D.N.M. 2012) (explaining that statements accusing an executive of having a "cowboy style of leadership" stemming from his desire to "show off and make a big splash" reflected critics' opinion or belief rather than any facts about the executive (internal quotation marks and citation omitted)); *Sellers v. Time Inc.*, 299 F. Supp. 582, 586 (E.D. Pa. 1969) (holding a writer's speculation about a subject's thoughts was not actionable because "[s]uch a statement is merely an expression of the opinion of him who makes it," "the truth or falsity [of which] is probably not even susceptible of proof"), *aff'd*, 423 F.2d 887 (3d Cir. 1970). Even if the statements could be characterized as being based in fact, the statements are not defamatory. The inference from this passage—that these children are seeking or have been promised fame or are "showing off"—may annoy or embarrass an individual but does not "grievously fracture[] [the person's] standing in the community." *See Tucker*, 848 A.2d at 124.

9

Finally, the McCaffertys contend the Article is defamatory because it suggests C.M. authorized the use of his photo. *See* Am. Compl. ¶ 41(l). But nothing in the Article implies C.M. cooperated in its preparation. Indeed, the Article references a request for an interview with M.M. but not C.M.—and the photo, which depicts C.M. with a 2016 campaign sign—is credited to a third party. Even if this authorization was suggested, in light of the Court's conclusion the Article contains no defamatory statements about C.M., it would not be defamatory. Because none of the challenged statements are capable of defamatory meaning, the McCaffertys' claims for defamation as to C.M. fail.

In addition to asserting C.M.'s claims for defamation on behalf of C.M., the McCaffertys also assert these claims on their own behalf. *See* Am. Compl. ¶¶ 42(a)-(i). The statements in the Article, however, are incapable of being fairly and reasonably construed as concerning them. Although the McCaffertys cite to several cases to argue the challenged statements defame them by implication, none of the cited cases support their position as the challenged publication in each case cited identified or explicitly referenced the plaintiff. *See, e.g.*, *Sarkees*, 37 A.2d at 545 (advertisement with photos showed plaintiff's name on business windows); *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 8-9 (Pa. Super. Ct. 1982) (article on police corruption repeatedly mentioned plaintiff by name).

They also offer no support for the proposition that statements about a child automatically implicate the child's parents. And in fact, the law suggests otherwise. *See Zucker v. Rockland Cty.*, 111 A.D.2d 325, 326-27 (N.Y. App. Div. 1985) ("The article in question cannot be said to be defamatory as to the plaintiff parents, as they are neither mentioned by name nor otherwise identified, and no other theory of liability is even suggested."); *see also Downtown Grill, Inc. v. Connell*, 721 So. 2d 1113, 1122 (Miss. 1998) (explaining parents cannot pursue tort claims based

on harm to their children because "[t]his Court realizes what a *Pandora's Box* would be opened if we allowed both parents and their children to recover for alleged wrongs against the children"). The McCaffertys' claims for defamation will thus also be dismissed.

Relying on the same statements the McCaffertys challenged as defamatory as to C.M., the McCaffertys argue the Article casts C.M. in a false light. To plead a false light claim under Pennsylvania law, a plaintiff must allege actual malice—i.e., a "highly offensive false statement was publicized" by the defendant "with knowledge or in reckless disregard of [its] falsity." *Santillo v. Reedel*, 634 A.2d 264, 266 (Pa. Super. Ct. 1993). The McCaffertys have failed to sufficiently allege actual malice.

The McCaffertys allege Newsweek was motivated to publish the Article because of "anemic sales and online hits." Am. Compl. ¶ 18. Publishing statements to increase profits, however, is insufficient to show actual malice. *See, e.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) ("fact that the defendant published the defamatory material in order to increase its profits" insufficient to prove actual malice); *Taha v. Bucks Cty.*, No. 12-6867, 2015 WL 9489586, at *5 (E.D. Pa. Dec. 30, 2015) (same). The McCaffertys also allege Newsweek engaged in substandard journalism, *see* Am. Compl. ¶ 23, but even an "extreme departure from professional standards" fails to meet the actual malice standard, *e.g.*, *Harte-Hanks*, 491 U.S. at 665; *see also St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (holding a defendant's "fail[ure] to verify the information with those . . . who might have known the facts" fell short of establishing actual malice); *Marcone v. Penthouse Int'l Magazine For Men*, 754 F.2d 1072, 1083 (3d Cir. 1985) (A "[f]ailure to investigate, without more, does not demonstrate actual malice."). The allegations thus fail to adequately allege actual malice.

Even if actual malice was sufficiently alleged, the challenged statements cannot be characterized as "highly offensive." *Krajewski v. Gusoff*, 53 A.3d 793, 807 (Pa. Super. Ct. 2012). To be highly offensive, the challenged language must constitute a "major misrepresentation of [a plaintiff's] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position." *Id*. (quoting the Restatement (Second) of Torts § 652E cmt. c). As explained above, the Article discusses the phenomenon of children speaking out about politics and criticizes adults and political groups for using these children for political gain. In this context, the statements—individually or collectively—cannot be characterized as highly offensive or a major misrepresentation of C.M.'s character, history, or activities.

In addition to asserting C.M.'s claims for false light on behalf of C.M., the McCaffertys also assert these claims on behalf of themselves. Because actual malice was not sufficiently alleged and the challenged statements cannot be characterized as concerning them, their false light claim will also fail.

**CONCLUSION**

The McCaffertys' defamation and false light claims on behalf of C.M. will be dismissed because the challenged statements in the Article are incapable of defamatory meaning or placing C.M. in a false light. The McCaffertys' own defamation and false light claims will also be dismissed because the Article fails to mention them and cannot reasonably be understood to be about them. Accordingly, Newsweek's motion to dismiss will be granted.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, C.J